Good morning, ladies and gentlemen. Please be seated. Let me apologize for starting just a little bit late. I had an unavoidable delay, so sorry about that. When your case is called, please approach the podium. State your name very clearly and who you represent. This is a recording device, so it's not a microphone. So keep your voice up so that we can hear you. Please remember that we've read the briefs, we've read everything, so get to your strongest and most important arguments first. You will be allowed 15 minutes per side. The appellant should save a few minutes for rebuttal. And we're not strict clock watchers, but if you go on too long, I'll ask you to wrap it up. Please call the case, Madam Clerk. Case call, 35-07, Marissa Mykytiuk v. Julia Hamos, Director, Illinois Department of Health Care and Family Services. Could you both come up and say your name and then? Good morning. Nick Albuquerque, A-L-B-U-K-E-R-K. I am the attorney for Dr. Mykytiuk, who is here in court. Thank you. I'm Valerie Quinn on behalf of Dr. Hamos and the Department of Health Care and Family Services.  Thank you. May it please the court. Today's argument really is, I think, a very fundamental one for doctors across the entire state of Illinois who are trying to provide medical services to the poor. Our system, obviously, is the Medicaid system. And Dr. Mykytiuk, who is here today with us, that's all she ever wanted to do and what she did for 20 years. She worked for various clinics. Unfortunately, records keeping and medical records has become an industry unto itself. Hundreds of millions of dollars are now spent on medical records and keeping of medical records and making sure medical records are secure and accurate. And the best way to keep medical records secure and accurate is to have them in one place with a professional organization, with someone who's been trained to keep those records. Doctors, they put the information into the records. That information has to be accurate. That's exactly what Dr. Mykytiuk did in this case. Excuse me for interrupting. Alternate payee payment document that she signed, she signed it over to HISOP. Is that the right pronunciation? I think that's it. What's their current status? Are they still in business? No, they've been out of business for years. Did they file a bankruptcy? That much I don't know. I know they're out of business. I know that one of the crippling things that happened was that they lied and said that my client was a 70% ownership, and they did that so they could avoid all sorts of requirements to become a clinic. When my client then quit and got away from the organization, it basically spelled the end of the story. When did she leave? When was this? It's in my brief, and I believe the materials were provided in terms of her retirement letter. I know it was cited, too, in an opposing counsel's brief, so I apologize. But it was before the audit occurred. There was a period where she was approached. If we were to reverse, are records still available from HISOP? I doubt it. In fact, this was also put into the briefs. What happened was my client went to HISOP over and over again. She was barred access to the records, but she was very persistent. She went there over 20 times. She was eventually, when the owner of HISOP, this reverend, was no longer there one day, she was actually able to sneak in and get to the records. And there was testimony in the record from a friend of hers, who was also a doctor, who told that basically the records were lying in a state of shambles, water stain, and no longer. So if we were to reverse, those records are not even available? I doubt they are available at this time. It sounds to me like eventually my client was allowed to get into their storage room, and when she got there, the records had been removed and or destroyed. Let me ask you something, Mr. Albuquerque. When she left the employee of HISOP, did she send, and I can't remember if I read this, did she send a letter to the department telling them that she was not a 70% owner? She, I believe she sent her, I know the retirement letter wound up in the, it did wind up in the hearing officer. It did wind up with the hearing officer and did wind up with the ALJ. I can't say whether or not she exactly reported this or not. I'm not sure if that's the right. That was the underlying reason for her quitting, that she found out that they had misrepresented that she had the 70% ownership. And I'm just asking whether she had informed the department that that was not correct, and I don't remember. I didn't know about it. Please, ma'am. I apologize. No problem. I don't know that she actually reported it to the Illinois Department of Public Aid. I know that she quit. I know she gave a formal resignation letter, and I know that formal resignation letter did end up in the formal record of the ALJ. Okay, another question. She worked for two other entities that provided medical services to Medicaid patients. Were those two entities owned by the same person? No. Or the same entity? No. Those are two separate. It was 26th Street Medical Services was the one, and I can't remember the other one. But in any event, and if you take a look at the breakdown statistically. And another question. What's our standard of review, counsel? Well, the standard of review, unfortunately, is clearly erroneous. And I think it was detailed in both briefs. Well, if you think it's clearly erroneous, delineate for me what you think the hearing officers, which findings of the hearing officers you think is clearly erroneous for purposes of reversal, because that's what you're asking us to do. Sure. Well, first, the sign-in sheets. They would not consider the sign-in sheets as evidence. Now, if you take a look at the rules and regulations here, they say that they are supposed to simply look at pertinent information. That's all they're supposed to look at. And the sign-in sheets, and this was detailed in some of the briefs. The sign-in sheets really doesn't have the different categories of noncompliance that the department has. The sign-in sheets wouldn't satisfy some of those compliance issues. It has the name of the patient and the date. And I'm not sure what else. And the service provided. The name, the date, and the service provided. Not all of the sign-in sheets had the service provided. Some of them did, but not all. So, I mean, what are we supposed to extrapolate from that? Maybe another question. Is the sign-in sheet the same as a medical record, in your opinion? I think that distinction is one without a point, because there is no requirement for my client to keep a separate set of medical records. Nobody said anything about separate. But according to the agreement, there is a requirement for her to have medical records that are in compliance with the department's standards and be able to produce them when the department asks for them. And, Judge, I would take some issue with that particular formulation. In fact, if you take a look at this is Section 140.30B. Excuse me. I gave that incorrectly. There's two sections. One is 305 Section 5-12-4.25E1. What it really says is that they have to grant, that my client has to grant timely access to the records. Really the question here is, what is a fair burden upon doctors? And Section E1, all it requires is that my client be granted timely access. Did my client maintain proper records? Yes, she did. The problem is she couldn't get access. She was literally barred access to them. And then they were destroyed. Ms. Albuquerque, she signed an agreement that said she should be responsible for the accuracy and truthfulness of all bills submitted to the department on behalf of the practitioner. And that she understands and acknowledges that it is her personal responsibility to review any and all billings before such billings are submitted to the department in her name. What did she think that meant? Well, she felt that meant that she was supposed to keep accurate records, that she was to make sure that those records went to the clinic so that they were properly maintained. That is good practice and that's good procedure. And that's exactly what she did. What it doesn't mean and what it can't mean and what it is absolutely unfair to mean is that she is literally sitting with the bill providers every single day and taking photographs of every single piece of paper in the office because that's the burden that the ALJ and that these administrative rules put upon doctors. That's not fair. Let me ask you, generally in the medical area, in hospitals, clinics, wherever, do doctors maintain separate records of all their clients or their patients? No, and that's illegal. I believe that's 100% illegal. You can only have one. If this Court could imagine for a second, if that all of a sudden came to pass, as was suggested to the ALJ, there was someone from the department that came in and actually said, with no support whatsoever, that the doctors are supposed to keep an abstract of records. That should make any lawyer scream because if we could only imagine the craziness that would ensue if doctors had their own private set of records that was maybe ever so slightly different than the records that were kept by the hospital or the other staff. Could we only imagine the insanity? Oh, well, the doctor kept a record of X, but the doctors in the hospital didn't. And which set of records is accurate? Can you only imagine a medical malpractice case or a car accident case if we had all sorts of different information all over the place because we have different records all over the place? That's what they're suggesting. So your suggestion is that what she agreed to in the documents authored by the department is what? Is a standard of reasonableness as to what she could put in control. They are unenforceable for what reason? They are unenforceable because they violate due process. They violate any standard of reasonableness, and they ask her to violate the law. We have a fundamental conflict of the laws here. We can't ask hospitals and doctors to keep medical records private and at the same time have them being kept by every single doctor who sees a patient. That would be sheer insanity and is not a workable system. Are you talking about violation of HIPAA? Violation of HIPAA and several other rules and several other basic fundamental services that are provided by doctors to patients would come under all sorts of scrutiny. We literally, if we're going to require doctors to do this, we're opening a Pandora's box of a mess. Assuming what you're saying, well, the underlying premise is that Dr. McIntyre, Dr. McIntyre did not have control over these records. The facility kept the records as they were required to do. They wouldn't let her see the records and all of that, and had she been able to present information to the administrative hearing officer, all of this would have come out. Why didn't she subpoena the owner of this clinic and subpoena the records? The department rules grant subpoena powers. When she filed a motion to join, the ALJ denied that motion, but she still had subpoena powers available to her. Why didn't she use that? On the premise that if the hearing officer had heard, look, I'm not responsible for this, these other people keep the records, here is what's going on. But she claims that she was never able to present that information because she was prevented from joining the HICUP and the owner of that clinic as necessary parties. Can you speak to that? I can. Obviously I wasn't the lawyer then, and I can't say very much to it. It's a very important point because all of your arguments seem to turn on that. And here's the best I can figure out from the record. From the record it seems that the ALJ had essentially said, we don't care what HISOP does, we don't care what this reverend does, we don't care how they maintain the records, we don't care if they've barred the records, she's being held strictly liable. Therefore, what's the point of subpoenaing this person? What's the point of subpoenaing the records? Because, A, we know the records don't exist at this point because she's already been to the facility and the records no longer exist. That's number one. Number two, we know that this Reverend Griffin isn't, even if he did show up, the ALJ isn't going to listen to him anyway because she's held strictly liable. So what's the difference what he has to say? Let me, you know, she signed a couple of things by granting powers of attorney to the administrators of this clinic that did all the things that caused her to be in this situation. Part of the language that she signed says, the person appointed must be a trusted employee over, well, that's part of the department rules. The person appointed must be a trusted employee over whom she has direct supervision on a daily basis. This wasn't so, obviously, from what you're saying. So why did she sign that? Well, and I think we're doing, you know, 2020 hindsight is very sharp. She thought she was working with a professional organization. She thought she was working with people that she could trust. Everything was going fine. And then all of a sudden, one day she found out they had lied and said that she was a 70% owner so that they could skirt a whole bunch of rules and regulations and get around a whole bunch of stuff. You know, unfortunately, like any business relationship, or personal relationship, you know, things only go so far. And then you find out about the lie. And as soon as you find out about the lie, as soon as you find out about something else, you move forward. And she thought she quit the job, and she moved away from those folks. But then the audit came in, and now there was this huge animus between the Reverend Griffin, whose business was going down the toilet because he no longer had a 70% doctor-owner to rely upon, even though that was false. And he held her responsible for that. Let me ask you a question. Excuse me. Go right ahead. No, I've been asking all the questions. Okay. Go ahead. The ALJ, he denied a motion to join in Hyspis and Griffin as necessary parties. Did that forum at that time have jurisdiction to allow the joining of them as necessary parties? Absolutely. There's a rule right on point that says that they can join any necessary party. And I cited to it in my brief. Would it have been an abuse of discretion of the ALJ to deny that? No, absolutely not. I mean, the rule is clear. They can do it if they want to. Is it an abuse of discretion to not join them? Under the facts of this case. Oh, it's an absolute abuse of discretion. Because ultimately any tribunal, if it's going to comply with basic due process and fairness, has to have everyone who's liable, everyone who is potentially at fault in one room to figure it out. And if you don't have all the parties, then there's going to be a fundamental unfairness, which is going to wind up being a huge mistake that's going to rise to that level. I think the code says amendments may be allowed in just and reasonable terms to join in any party that ought to have been joined. Now, did the hearing officer ever make a ruling that this was, as far as the just and reasonable terms issue, to join the third party? My understanding from the record is that what the ALJ said is it doesn't matter because she's strictly liable. It doesn't matter if we join this party or not because we can put the whole burden on her. It doesn't matter what other people did because we can put it all on her. Even though she only made $40,000 a year, we can put the whole half million dollars on her. And it doesn't matter if we bring in other people who committed fraud, who committed deceit, who did any of this stuff. Good recovery, Mr. Albuquerque. I have another question. Can Dr. Mekithia still seek indemnification from Griffin and Hisop in the circuit court? Not practically. Only in a theoretical sense. He basically went out of business a short time after this. Nobody knows where he is. The whole company is gone. Who knows where he is now? Because the department rules allow them to essentially joint and several options as to who they should go after for the money, as far as they were concerned, she's the only viable target. So they went after her and they're allowed to do that, right? Well, but that wasn't the case several years ago when the ALJ heard this matter. And that's the real problem here. Essentially, you know, in business matters, you know, people go bankrupt and they move on. And that wasn't the case. The company still was nominally operating around the time that the ALJ heard the case. Why do you suppose they made the decision? This is highly unusual. Why do you suppose they made the decision to go after this physician individually? I'll ask your opponent, too. Yeah, I mean, frankly, the only thing I can come up with is administrative laziness. These rules were created to make it administratively easier and to deny justice, deny justice at the expense of administrative ease so that Ms. Hope Little doesn't have to do any extra work, so that the ALJ doesn't have to do any work, so that we don't have real – the less you hear, the less work you have to do. And that's the only thing I can come down with. So you're saying the agency worked on the premises. We don't care who the real wrongdoer is. We're just going to do something to wrap this up. That's right. That's exactly what happened. Counsel, was there any investigation into the assets of your client? No, not that I know of. I mean, there's hundreds of thousands of dollars hidden away somewhere in accounts. I mean, do we know this at all? In terms of my client's assets? Right. No, she doesn't have that. I assure you she doesn't have that money, but there was never any investigation as to how much money she had, if she had the – how much money she was – I mean, I'm sure it was mentioned during the hearing that she only made about $40,000 a year. I mean, was there a production of any IRS reports or any financial – as far as her financial situation? I know that there was a testimony. I don't think there was actual documents from the IRS or anything like that. That was never taken into account. It didn't matter to them. Thank you. Under the codes and rulings of that agency, it permits recovery for what is quote-unquote over-billing. Now, I note that the parties stipulated that there was a discrepancy, quote-unquote, of $200,000 plus, which now present value is half a million. Was there any evidence at all presented that this discrepancy was, in fact, an over-billing? No. The only thing – the only evidence that was presented was that the bills don't exist. They only did this as if it was an over-billing, not that we have evidence that it's an over-billing. In fact – and then, of course, you know, had they looked at the sign-in sheets as viable evidence or an abstract of what occurred, I think they would have found – So there was a discrepancy stipulated, too. Right. But as far as further evidence presented that it was an over-billing, that's absent. That's absent. There's no evidence. It could have been fraudulent billing. It could have been. Anything's possible. We don't – my client knows that she saw a whole lot of patients, and she knows she kept accurate records. But unfortunately, because she was never given the entire record, and she was never able to see all of the records that were kept by HISOP, she can't do an exact match-up of exactly the exact number. But as far as we can tell, as far as she can tell, it could have been fraud on the part of HISOP, or it could have just been HISOP lost their records. An over-billing in terms of the department's definition is anything that they paid for that didn't fit into one of the categories, you know, the A through E categories, like if the wrong provider name or if the date wasn't provided or if the incorrect diagnosis. All of those things constitute over-billing. Is that correct? In terms of the department's definition, because when one thinks of over-billing in the normally understood way, you think, oh, well, maybe this costs $20 and you bill $40. But that's not what over-billing means in this context, is it? That's correct. They took an all-encompassing approach, which is fundamentally unfair. They essentially have no burden. I'm just trying to understand that because I think that the way the language is written in terms of over-billing, it's not the way it's commonly understood in real life. It's over-billing in the context of the department's rules, which anything they pay for, if it doesn't conform to a specific set of rules, is considered over-billing if they paid for it. So what's the difference between a discrepancy and an over-billing? Well, a discrepancy would be something that, like in this particular situation, there's no evidence that my client didn't perform the services and didn't do them correctly and didn't bill them correctly. What there is is discrepancy between the amount that was paid out and what can be proven through records. Right. So are those terms defined anywhere? Discrepancy, I don't think it is. Over-billing, I know, is defined throughout, but I don't know if discrepancy is defined. So is that a distinction without a difference that they stipulated to a discrepancy versus stipulated to an over-billing, or there's a major difference? I think there's a major difference. I certainly think there's a major difference, and I think reasonable minds should see it as a very reasonable difference. Why did they stipulate? It seems to me that it's not clear that any of this happened or it happened with any certainty. I mean, I'm curious as to why she would stipulate. I think the feeling was by the trial attorney at the time, and obviously it wasn't me. You've pointed that out several times, Counselor. That perhaps the issue really is whether or not it's fair to hold Dr. McIntyre responsible, given the fact that she did everything she could. She worked in good faith, and she bent over backwards to try to get these records. And, I mean, even during the hearing, they even brought in an employee from HISOP that even testified that, no, this guy was barring her from the organization for a long time. Okay. Could you wrap up, please? Sure. Well, in any event, I would ask simply that this Honorable Court find a way to do justice to my client and to see that there has to be a reasonableness in the law for someone who is acting in good faith. And my client was acting in good faith. And, therefore, she should not have been terminated from the program. She should not be made to pay over half a million dollars for which she is not responsible. And that necessary parties should be joined to action so that true justice can be done. Thank you. Thank you. May it please the Court. It is settled. Please state your name again. Oh, I'm sorry. I'm Valerie Quinn. I'm here on behalf of Director Jamos and the Department of Health Care and Family Services. And, Your Honor, I would take exception to characterization that the Department and any of its employees is lazy. We're talking about a 2,500-page- What's the standard of review, Ms. Quinn? It is, for factual findings, it is manifest weight. For mixed questions, it is clearly erroneous. And for legal questions, it is de novo. What's the standard of review for the issues that are before this Court, the main issue that's before the Court? That would be clearly erroneous, Your Honor. And the ALJ's findings and conclusions, the Director's conclusions, were not clearly erroneous. It is settled law that members- Let me ask you, we're real familiar with the facts. You make a point that Dr. McKitty could have subpoenaed the patient records as well as Mr. whatever his name is, Grant or Griffin. At what point in the proceedings could she have done that? She should have done that. She could have done that probably at any- Certainly she could have done it when the ALJ suggested that she do it, when he denied her motion to join him as a third party. Wasn't the hearing in process at that time? That was prior to the hearing, but she should have done it at that point. But they were, unless I'm misunderstanding, that the hearing, the process had begun. Are you saying she should have asked for the continuance? Practically, when should she have done that? She probably should have done it beforehand, but she certainly should have done it when the ALJ suggested that she do it. He told her, this process is available to you. You can take advantage of it. He basically signaled to her that if she asked for it, he would issue a subpoena and get those records in to the extent they existed. That wasn't said in the record, was it? The ALJ told her who? He suggested that she take advantage of the subpoena process, and that is in his ruling. As I read it, it's page 2069 of the record, where he says the subpoena power is available to you. Denying your motion, but this is the option. Okay. Counsel, what were the reasons given by the ALJ for denying the ability to amend to add on a third party? Because there is joint and several liability. What did the ALJ say, though, in the ruling? In the ruling, I believe he said, I don't have his ruling in front of me, Your Honor. To the best of my recollection, he said, and I can't remember it. I believe he said that she's jointly and several liable, and I would, you know, if the court would like, I can go look it up. Let's assume for a moment that was the reason. So the attitude was, well, why bring in a third party then? She's going to be liable anyway? I'm sorry, Your Honor. Why do we allow people to bring in third parties then? Are they allowed in these kinds of actions? I believe now they are. I'm not sure if they were at the time, but I do believe now the rules have been amended, and they are allowed to bring them in, but it would be a matter of, you know, a matter of discretion. So have the rules been amended since this hearing? I believe they have. But again, if the court wishes, I would be glad to. Well, this is really crucial, counsel. It's really crucial whether the rules are what the rule was at the time, what they are now. So I think it's important for you to tell us, to answer Justice Conner's question. I would if I could, Your Honor. I do not have the ALJ's ruling in front of me, so I cannot remember if he said based on the rules I cannot or it's discretionary because she is jointly and several liable, and therefore it really doesn't matter. We are talking about not a bottomless pot of money here, but taxpayer funds. Can you respond to your opponent's comment that the ALJ's attitude throughout the record in the ruling was this is a strict liability situation anyway, so why bring in anybody else because you're going to be liable anyway? I mean, that's essentially what your opponent has argued. How do you respond to that? That is certainly how my opponent characterized it, Your Honor. How do you use that? How do you characterize it? She is jointly and several liable, and she is the one who contracted with the department. She is the one who said, I will be responsible for all the billings that go out under my provider number. Me, not HISA. And so she – Well, counsel, in these clinics that serve the underserved population of the kind that Ms. – that Dr. Kektir served, is it unusual to have this kind of agreement where the physician provider essentially makes the agreement with the department and then is employed by a clinic? Is this – was her situation unusual? To be an employee of a medical service? Yeah. That's – it's not unusual, but it's not required in order to medicate patients. Oh, I know it's not required, but was it unusual? But you have – It's not unusual. The department has thousands of physicians around the state that are in similar situations, right? I expect so. Do you expect all of them to keep – to be responsible for the medical records? Whose responsibility is that? That's a different question. Okay. The doctors agree when they become Medicaid providers that they will be responsible for the medical records, and they will provide them to the department upon request. I understand that. I read the passage to you, so you know I know that. But I am asking you, how does this – how does the department practically expect this to be carried out? Okay. There are very few of these sorts of cases every year, these sorts of overbilling cases. Probably most employers will provide the records, or the doctors have them themselves. Let's follow up on that, counsel. Do they have them themselves, truly? It is advisable, and it's actually recommended in the physician's handbook at 202.41, for one example, that for doctors whose patient records are kept in a facility that is outside the doctor's physical custody and control, that those physicians keep an abstract. And that abstract is to include a diagnosis, a treatment program that dates and times the services were provided, and the recommendations.  That is protection not only for the doctor in a case like this, but also for the patient, because it ensures patient continuity of care. Because what if there's a fire where the charts are? Are those patients supposed to be out of luck now because nobody bothered to make an abstract? I mean, this is not a HIPAA violation. Is that the standard of care, Ms. Quinn, that in – you know, if you go to the University of Chicago or some other hospital for care, do they have an abstract housed someplace else? Is that the standard of care? That is what – an abstract is what's recommended. Or is that a departmental rule? They're two different things. Is that the standard of care? I believe it is a standard of care to make an abstract. And on what do you base that? Well, I don't – again, that is – if the court would like me to file supplemental authority, I'd be happy to look that up. Well, my next question is, is that a departmental rule, which may be different from the standard of care? It is certainly recommended in the departmental rules. I do not know if it's part of the standard of care, but this is not the person – Your opponent says that that would be a violation of the standard of care, to have a doctor keeping records personally in her own home or wherever it is that she may keep them, apart from the facility in which she's actually treating the patients. What do you say to that? Not so. As long as they are keeping those records securely, there is no violation of the standard of care to have an abstract or something to protect yourself and protect your patients. For example, if you're talking about nursing home patients, they may not be able to communicate what their medical history is or what their needs are. And if something happens to their chart where it's kept, you want to have some kind of backup. I don't – there's no way you wouldn't. Well, let me ask you another question. Would the ALJ be interested in why Dr. Matyikio wasn't able to produce the records that the department required? Is the why of the situation important? It certainly bears on whether she made an effort on her own to get those records in there. And the ALJ recognized that she did. That wasn't the question. Was it important or not important in his resolving that issue? Well, actually, no, it wasn't, because she testified that she never checked her bills. She never checked that anything that went out under her name was accurate, Your Honor. So why she wasn't able was not important? At the end of the day, no, it doesn't matter. She is strictly liable, Your Honor. So you're agreeing with your opponent that the ALJ really didn't want to hear anything because he had already determined that she was strictly liable. That's basically what you're saying. He made no determinations ahead of time. He listened to the entire case. But it is a matter, Your Honor, of strict liability. She agreed that she would produce those records. She agreed she would review the billing. She agreed that billing would be done by somebody under her supervision and control who reported to her. And none of those things were true. She understood what she was signing. She did not abide by those agreements, Your Honor. So how would she have been able to gain access to the medical records after she had left the employee of HISOP? How could she get those records to either refute or in any way challenge the findings of the department's auditor? How could she get those records if she's no longer employed there? Two points, Your Honor. One is she has three employers. Two of them produce the medical records. And she was not employed at this third one. That's the only one I'm asking you about now. Never mind the other two because that's not really the same. That's not an issue right now. How would she get the records from HISOP to either disprove or challenge the findings of the department audit if she no longer worked there? She could have subpoenaed them, Your Honor. And she did not do that. It's not on the record why she didn't do it, but she didn't do it. And she testified that she worked for HISOP for, I don't know, a year or two. She never sought to look at any of those bills during the time that she worked there. Now, she is in the best position. When she applied to HISOP, she could have researched their standing in the community. When the department paid the money for her services, did the money go to her or did it go to HISOP? It went to HISOP. Got it. And how would she know what was being billed and what was being paid to HISOP? Because they paid her a salary. But she could have checked the bills before they went out. That's what she agreed to do under her provider agreement, which is required by federal law as a condition of state participation in Medicaid. The same question I asked your opponent. There are thousands of doctors all over the state that provide this kind of care to an underserved population. Do you require all of them to check the bills before they send them out to the department? They agree that's what they're going to do. I know what they're supposed to do. But practically, is that what's being done? I'd like you to answer the question. Well, I know her witness testified that she doesn't do it, and Dr. McKee testified that she doesn't do it either. But that is a clear violation of her agreement. Does the department look into that at all, or is that important in the department's process in determining whether or not these bills are appropriate? It doesn't come up until there's an audit, Your Honor. And, you know, audits are random or they're done based on an algorithm. Well, now that it's come up, what has the department done about that? I do not know, but I can look into that, Your Honor, and I would be happy to file a supplemental brief if that would be helpful to the court. Why didn't the department join in the real wrongdoer here when there was still a viable operation of HISEP and this Griffin individual was available? Are you privy to that information? I well know your argument that it's joint and several. We can pick who and choose who we go against. But as a matter of conscience, I'd like to know why the real wrongdoer wasn't pursued. Dr. Mikituk is the one who agreed with the department. She is the one who contracted with the department. We're talking not about a bottomless pot of money, Your Honor. We're talking about taxpayer funds. Now, the department could expend scarce resources chasing down HISEP, or it can go after the party who is contracted to be responsible for the bills. But this problem goes all the way down to its ALJ, supposedly an independent controlling entity in this instance, and we have an ALJ denying her request to bring them in. Your Honor, she was the one who contracted with the department. Whether or not he was a wrongdoer, she still has the option of going after him, filing a third-party indemnity complaint. But she's the one who agreed to be responsible for these medical records. But, counsel, on the public policy issue, if we're so concerned about this money that the people of the state of Illinois have been cheated out of, we would just go after someone who you pretty much know is not going to be able to pay it back. What about the Deep Pocket? What about that part of public policy? I'm sorry, who is it? HISEP, who had the money, maybe, but why wouldn't we go after them? Because it would have been – these are scarce resources. To expend resources to go after him when the agreement, the provider agreement, was not with him. But the possibility of recovering would have been greater than against a doctor that's making $40,000 a year. That is a leap, Your Honor. According to counsel, he was out of business. He had no money. His business was circling the drain at that point. She is the one who contracted with the department, and she has the option of bringing him in to indemnify him. And I understand that. But, again, the people of the state of Illinois are up this money now, and the department didn't even try to go to the Deep Pocket to get it. And, Your Honor, it's not just this money. Under federal law, when there has been an overpayment, okay, the state has a year to go after and recover the money. And at the end of the year, if we haven't recovered it, not only are we out whatever we overpaid for the services that we shouldn't have been billed for, but we also have to give the feds back roughly half of the money. So in a case like this, we're out $250,000 that we have to give back to the federal government because of cases like this. Do you have any idea whether this physician can pay $533,000 or whatever? It means a significant amount of money. So you said that you talked about the expenditure of scarce resources to recover it from Hisop and Griffin. And at a time when you could have done that, they were still in business, as far as I can tell from the record. Now they're not. So what about that? How are you going to recover it from a person, an individual who doesn't have the money either? Let's assume for the moment that she doesn't have the money. I don't know that. You don't know that. But let's assume. How is that going to help the state along the arguments that you are making? It helps the state because if she cannot recover, if, you know, if there's a bankruptcy, if there's some other – if it turns out that the judgment is not collectible, then the state will not be liable for that money. We had to give it back, but there would be adjustment made in the future because the debt is uncollectible. So your argument is it was just easier to go after her, so you thought the decision was made to go after her because that would be easier? She is the one who agreed to be responsible, Your Honor, not Hisop. All right. Just say that again. Because, again, you say if it's found out that she's not physically or financially able to pay the judgment, there's a difference in what you owe the federal government? Yes, Your Honor. Yes, there is. And that is at 42 CFR 433.300. So there's no incentive to go after the Deep Pockets because there's more money to pay back to the federal government. It assumes that there even were any Deep Pockets there, Your Honor. Well, I think that the record certainly suggests that Griffin and Hisop were still in business when all of this started. They have since gone out of business. And at that time, nobody made it, at least it's not in the record, no one in the state made any effort to collect that money from what would have then been the Deep Pocket. Isn't that correct, Counsel? Hisop was not brought in, Your Honor. That's correct. Her motion to join was denied. That is correct. Anything else? In her brief, she argued that there's nothing that legally defines what a medical record is. That is not correct. But I think based on the court's discussion of the sign-in sheets and what they do and do not show, I mean, it's a bunch of names. I mean, those people might have signed in to play, who knows what, signed in for lunch, signed in for a waiting room. It is nothing that documents the nature, scope, details, and receipt of any health care provided to those people. And, Your Honor, also there are instances where there are instances that there's an overpayment because charts were missing. There's an overpayment because specific documentation of a medical service was missing. There were overpayments because services were provided by other doctors and billed under her name. There are a number of ways in which there were discrepancies, and it all adds up to the one large. I understand. And their argument is that they had no access to the records, and they could not have an opportunity to present that information to the ALJ. But those were Hisop's records. There were other records, and not all of Hisop's records were missing, Your Honor. I mean, documented in the state's brief, there was a service given to a gentleman named Benoist Gordon on January 17th. That is documented in the record at page 1756 because there's a notation. It was group therapy. It was overbilled. It was for a psychiatric diagnostic interview. The documentation in the record actually showed nothing more than group therapy. So it was billed by Hisop, presumably, at a higher rate. The relevant pages are 642, which showed the differences in what was billed and what should have been billed. The record itself is at 1756. And this is a huge record. It's full of things like that, in addition to just the ones that were missing altogether. If the Court doesn't have any further questions, for the reasons articulated in our brief and here today, we ask the Court to affirm the Department's final administrative decision. Thank you, Ms. Fink. Thank you. Mr. Albuquerque, a brief rebuttal, please, and emphasis on brief. Yes, Your Honor. I want to correct one thing. The impression may have been left that the agency, the Department, had absolutely no control over Hisop. That's ridiculous. In fact, that's the reason why the Reverend who ran Hisop, Reverend Griffin, lied about my client being a 70 percent owner. It's because if he hadn't lied about that, the amount of control that the Department would have had over him is much, much greater. They still had control. They could have turned off the spigot of Medicaid. What are you talking about? So, in other words, they're trying to say here that somehow they only had control over my client. They didn't have control over Hisop. Is there some specific licensing process that Hisop and Griffin had to undergo in order to comply with being a facility where a doctor can't work and get paid? Yes. And that's the control you're talking about? Yes, absolutely. And that licensing for Hisop would have been much, much less onerous if a doctor were in charge because now the doctor has all the responsibility because she's a 70 percent owner. It turns out she wasn't a 70 percent owner, which is the reason why the Department requires much more stringent standards, much more stringent requirements for these clinics if a doctor is not an owner. That's the reason they lied on the paperwork and said that she was a 70 percent owner, to get around all those requirements. In any event, the Department could have shut off the money spigot to Hisop in a second. In order to get those records, all they needed to do was send a record to Hisop and say, you have a choice. You're going to receive no more money from Medicaid or you're going to turn over the records. They could have assisted in that way. They could have done their due diligence. They decided not to. Instead, they simply just held my clients strictly liable, is what they did, and they didn't go out of their way at all to get these records. Do they have procedural rules in their rule? I don't remember a procedural rule that requires them to specifically go to the facility or the clinic to ask for the records if the physician can't produce it. I don't think they have any rules. I don't know if they have any such rules one way or the other. But all I'm talking about is the rules. But you're just saying since they're the Department, they could have asked for the records. They could have asked for the records. Or they could have just sent a letter saying, by the way, this is an audit. You have to comply with the audit. If you don't, then we're going to shut off the money. But they sent the letter only to her and not to Hisop. Exactly. Their attitude was, nope, everything is coming through her. We don't care about Hisop at all. That's one thing. That's an important point. I do not remember seeing anything that suggests that a letter was ever sent directly to Hisop asking them to produce records. Can you confirm that? I can only tell you what's in the record. I didn't see anywhere in the record that the Department in any way contacted Hisop or in any way assisted in getting any of these records or threatened or done anything. Thank you. The incentive here from what I'm hearing from my opposing counsel is that if we can bankrupt the doctor, then we'll owe less. That's what I'm hearing here. And maybe I misunderstood that because this is the first time it's come up here in arguments, that they'll owe less if there's a bankrupt entity. Well, who's the bankrupt entity? My client. So bankrupt the doctor and we'll owe less. That is, I'm sorry, a very perverse set of incentives for the Department. And it's not fair that my client should have to bear the brunt of that. And just to put things in perspective, the overwhelming number that my opposing counsel talked about, one instance of a $50 bill when we're talking about $533,000, I think that's unfair. I think we have to look at the larger proportion of things. The overwhelming number of fees placed upon my client's head is an extrapolation, about $199,000 that was extrapolated out to almost half a million dollars. Overwhelming amount is missing records. In the end, I'd ask this body please to reverse the finding of the trial court, reverse the finding of the ALJ, and do substantial justice. Thank you. Thank you very much for a very interesting and spirited argument. We will take the matter under advisement and issue an order or an opinion. This court is adjourned.